UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                                          :
DOUGLAS M. REINHART,                            :    Case No. 05-25791REF
      Debtor                                    :    Chapter 13

MEMORANDUM OPINION

I. INTRODUCTION

      Before me is the Objection filed by Debtor, Douglas M. Reinhart ("Debtor"), to the proof of claim filed in this Chapter 13 bankruptcy case by Claimant, Craig E. Dallmeyer ("Claimant"). Because I find the testimony of Debtor and his expert witness, Michael Patz ("Mr. Patz"), credible and persuasive, I sustain the bulk of Debtor's Objection and find that the majority of Claimant's claim was satisfied when he levied upon the assets of D & E Enterprises, Inc. ("D & E").

      I begin my analysis with a summary of the relevant facts.

II. FACTUAL BACKGROUND AND FINDINGS

      Prior to the filing of this bankruptcy petition, Debtor was the sole shareholder of D & E, a company that conducted a coin operated amusement and vending business. Part of the business operated by D & E involved placing amusement and vending machines at other business locations ("the placed equipment") and sharing the proceeds generated from the placed

1

equipment with the owner of the appropriate location. At some point prior to the filing of this bankruptcy case, D & E borrowed $650,000 from First International Bank, now by change of name, UPS Capital Business Credit (collectively "UPS"). This loan was memorialized by two notes, one in the amount of $400,000 and the other in the amount of $250,000, and was secured by an open ended mortgage and security agreement and by Debtor's personal guaranty. The mortgage and security agreement granted UPS a security interest in all of D & E's assets and a mortgage on the real property located at 131 N. Plum St., Lancaster, PA. The mortgage and security agreement also provided UPS with the right to collect delinquent amounts due under the loan from the proceeds collected from the placed equipment.

D & E began experiencing financial difficulties in 2003 and thereafter became delinquent on its loan payments to UPS. After consulting with UPS, Debtor commenced marketing efforts to sell D & E and its assets. Debtor then engaged Mr. Patz to determine the fair market value of D & E's equipment inventory, which Mr. Patz thereafter valued at $548,681.50 as of April 20, 2004. See Reinhart Exhibit 2.[1] In April of 2006, Apple Vending Co. ("Apple") submitted a preliminary written proposal to purchase all of D & E's assets, including the equipment inventory, vehicles and real estate, for $750,000, which proposal was subject to performance of a satisfactory due diligence review by Apple.[2] See Reinhart Exhibit 1. Debtor

---

[1] This valuation is based upon the value of D & E's equipment inventory alone, it does not include the value of D & E's business, vehicles, or real estate.

[2] This $750,000 proposal included a provision that required that D & E hold a 5 year note in the maximum amount of $212,000, with the amount of the note being adjusted annually by the difference between Apple's actual net weekly collection from the placed equipment and the assumed net weekly collection of $9,000. Alternatively, Apple's written proposal included an offer to purchase D & E's inventory, vehicles and real estate for $563,000, which offer was not contingent upon a guarantee of $9,000 in net weekly collection from the placed equipment.

rejected Apple's proposal as inadequate, and thereafter contacted Business Marketing Works, Inc. and Hess Business Brokers (collectively "Hess Business Brokers") to perform an evaluation of D & E's business and assets for the purpose of listing D & E's business and assets for sale. On July 9, 2004, Debtor listed D & E's business and assets, including all equipment and inventory, for sale with Hess Business Brokers for $995,000. See Reinhart Exhibit 3. Debtor testified that several people expressed an interest in purchasing his business, but that no offers were made.

A friend later advised Debtor to contact Mark Mentzer ("Mr. Mentzer") about the possibility of selling D & E to him, which Debtor did. Mr. Mentzer signed a Confidentiality Agreement on November 12, 2004, and investigated the possibility of purchasing D & E. See Reinhart Exhibit 5. Mr. Mentzer later determined that he was not interested in purchasing D & E at the price Debtor desired, because the price was out of his reach. Mr. Mentzer, however, was an employee of Claimant and suggested that he might be interested in purchasing D & E. Thereafter, Debtor, Mr. Mentzer, and Claimant met to discuss the potential purchase.

On December 20, 2004, a letter of intent was sent by Claimant's attorney to Debtor memorializing Claimant's offer to purchase certain assets of D & E. See Reinhart Exhibit 6. The letter of intent described the offer as 80% of the fair market value of the amusement machines (preliminarily valued between $200,000 and $400,000) plus $75,000. In addition, the letter of intent proposed to pay Debtor a lump sum consulting fee of $100,000, which amount would be reduced if Claimant lost any of D & E's major route customers during the first six month period following execution of the agreement. The letter of intent also proposed that Claimant would lease D & E's Plum St. facility for a period of six months at the

monthly rental price of $1000. The letter of intent was contingent upon Claimant performing due diligence and required a satisfactory post-closing inventory of D & E's equipment. See Reinhart Exhibit 6.

Thereafter, discussions continued between Debtor and Claimant, and in January of 2005, Debtor's counsel emailed a copy of a proposed Asset Purchase Agreement, Commercial Lease Agreement and Non-Competition Agreement to Claimant's counsel. See Reinhart Exhibit 8. These Agreements were never executed by the parties and the negotiations between Debtor and Claimant ceased.[3] Sometime during this period, Claimant learned about the financial difficulties being experienced by Debtor and D & E, and Claimant began communicating with UPS. In the meantime, due to Debtor's delinquency, in May of 2005, UPS notified counsel for D & E that it would exercise its right under the mortgage and security agreement to collect its debt from the proceeds of the placed equipment. To effectuate this right, UPS contracted with Eastern Coin-Op Amusements, LLC ("Eastern Coin-Op"), a company owned and operated by Mr. Mentzer, to act as its agent in collecting its debt from the placed equipment. See Reinhart Exhibit 10.

Thereafter, on May 20, 2005, Debtor filed his first bankruptcy petition, docketed to Case No. 05-23038, and subsequently, Debtor filed a motion in this Court seeking to prohibit UPS from operating the placed equipment. This motion was denied by Order entered on June 2, 2005, and Debtor's first bankruptcy case was dismissed on June 16, 2005 because Debtor failed to file required documents. Immediately following the entry of the June 2, 2005 Order denying

---

[3]Mr. Mentzer, however, did purchase some equipment from either Debtor or D & E. The record is not clear whether the seller of this equipment was Debtor or D & E, but resolution of this issue has no bearing on the matter before me. See Reinhart Exhibit 9.

his motion seeking to prohibit UPS from operating the placed equipment, Debtor filed a chapter 7 petition on behalf of D & E on June 3, 2005. On July 11, 2005, counsel for the Chapter 7 Trustee in D & E's bankruptcy case and UPS filed a Joint Motion for Stipulated Order, which Stipulated Order was entered on July 14, 2005, and granted permission to allow UPS or its agent to operate the placed equipment. See Claimant Exhibit 2.

On September 30, 2005, Claimant purchased from UPS all of the rights and interests of UPS to the loan, notes, mortgage, guaranty, and security agreement, obligating D & E and Debtor to UPS. See Reinhart Exhibit 11. On December 20, 2005, Debtor, as sole shareholder of D & E, Claimant and counsel for the Chapter 7 Trustee in D & E's bankruptcy case filed a Stipulation, which was approved as an Order of this Court on January 20, 2006, granting Claimant relief from the automatic stay in D & E's bankruptcy case and possession of the equipment owned by D & E that served as Claimant's collateral. See Claimant Exhibit 3. Pursuant to this Stipulation, D & E turned over possession of the placed equipment to Claimant and agreed to turn over the remainder of the collateral following Claimant's performance of an inventory. In February of 2006, Eastern Coin-Op, acting on behalf of Claimant, performed an inventory of the equipment stored in D & E's warehouse and workshop and then transported the equipment to his own storage facility. On February 22, 2006, an Order was entered approving the Trustee's Report, discharging the Trustee, and closing the D & E bankruptcy case.

Meanwhile, on September 26, 2005, Debtor had filed this chapter 13 petition. On April 14, 2006, Debtor filed a motion to sell, free and clear of all liens, the real property on which Claimant held a mortgage. Debtor desired to use the proceeds from this sale to fund his chapter 13 plan. Claimant filed a Response to this motion objecting to the sale, but later agreed

to allow the sale to occur with the net proceeds from the sale being held in escrow. On May 11, 2006, I entered an Order authorizing the sale. Pursuant to this Order, the net proceeds from the sale are being held in escrow pending this decision on Debtor's Objection to Claimant's proof of claim. See discussion, infra.[4]

On April 28, 2006, Claimant filed a proof of claim in this bankruptcy case, in which he maintains that the amount of his claim is $356,505.61, which is based upon a total unpaid debt of $464,820.61, less $108,315, which represents the value that Claimant ascribes to the equipment that he repossessed pursuant to the parties' Stipulation filed with this Court on December 20, 2005. Debtor thereafter filed an Objection to Claimant's proof of claim, in which he asserts that the $464,820.61 claim should be deemed to have been paid in full based upon the collections Claimant received from the placed equipment (which he claims was never properly accounted), the cash contained in the placed equipment (which he claims was never properly accounted), the value of the equipment that Claimant repossessed, and the value of the goodwill of D & E's business.

I now turn to a discussion of the applicable law and burden of proof.

III. LEGAL DISCUSSION AND CONCLUSIONS

---

[4] The exact amount being held in escrow is not clear because no evidence was introduced on this issue. Claimant contends that $108,178.06 is being held in escrow, see Claimant's Proposed Findings of Fact and Conclusions of Law, at ¶23, while Debtor claims that $106,157.64 is being held in escrow, see Debtor's Proposed Findings of Fact and Conclusions of Law, at ¶5. A determination of the exact amount of funds presently held in escrow is not necessary to dispose of the matter before me, however, because the issue before me requires only my determination of the amount of Claimant's claim. The parties agree that when the amount of Claimant's claim is determined, it will be paid from the escrowed funds.

6

The burden of proof in the claims litigation context has been described as a shifting burden. This burden was explained by the Third Circuit as follows:

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. §502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "prima facie" valid. (citations omitted). In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case. (citations omitted). In practice, the objector must produce evidence which if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts n the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. (citations omitted). The burden of persuasion is always on the claimant. (citations omitted).

In re Allegheny, Int'l., Inc., 954 F.2d 167, 173-74 (3d Cir. 1992). See also Galloway v. Long Beach Mortgage Co. (In re Galloway), 220 B.R. 236, 243-44 (Bankr. E.D. Pa. 1998).

Turning to the facts before me, I find that Claimant's proof of claim alleges facts sufficient to support the claim. The proof of claim alleges that the total amount of the claim is $356,505.61, and describes the basis for the claim as "money loaned." The itemization attached to the proof of claim alleges that the unpaid principal and interest as of February 4, 2004, was $425,411.11, that the interest accrued from February 4, 2004 through June 3, 2005 (the date Debtor filed this chapter 13 petition) was $39,409.50, and that the appraised value of the inventory repossessed by Claimant pre-petition was $108,315. The itemization then subtracts this $108,315 figure from the total amount of unpaid principal and interest (which Claimant

alleges to be $464,820.61) to reflect a total amount due of $356,505.61. In addition, Claimant attached the following documents to the proof of claim: (1) Copies of the Notes, the Mortgage and Security Agreement and the Guaranty that were executed by Debtor and D & E under which Debtor and D & E became obligated to UPS; (2) copies of the Assignment of Loans and Loan Documentation through which UPS assigned the loans and all supporting documentation to Claimant; (3) certified account statements; and (4) a copy of the appraisal, prepared by Claimant's expert, of the equipment that Claimant repossessed.

Having determined that the proof of claim alleges facts sufficient to support the claim, I hereby find that Claimant's proof of claim is prima facie valid. The burden of going forward, therefore, shifted to Debtor to produce evidence sufficient to negate the prima facie validity of Claimant's claim. Allegheny Int'l., 954 F.2d at 173. Because I find that the testimony of Debtor and his expert, Mr. Patz, met this burden and negated the prima facie validity of Claimant's claim, the burden therefore reverted to Claimant to prove the validity of his claim by a preponderance of the evidence. Id. at 174.

The crux of the issue before me involves determining the value of the equipment repossessed by Claimant and whether Debtor should be credited for the goodwill of his business as well as cash allegedly not accounted for by Claimant relating to the placed equipment. Once these issues are resolved and the amounts are quantified, they must be deducted from the total amount that Claimant is owed in principal and interest on the underlying loan (which is $464,820.61)[5] to resolve the amount of Claimant's claim.

---

[5]Debtor withdrew that portion of his objection to Claimant's claim that dealt with the amount of principal and interest due on the Notes. See Debtor's Response to Claimant's Interrogatories and Request for Production of Documents, Number 4, attached as Exhibit A to

8

Before addressing the value of the equipment repossessed by Claimant, I will first discuss whether Debtor should be credited for the goodwill of his business and the cash allegedly not accounted for by Claimant relating to the placed equipment.[6] Turning first to the issues surrounding the crediting of goodwill, I note that "goodwill" has been defined under Pennsylvania law as "the positive reputation a business may enjoy in the eyes of the public that creates a probability that old customers will continue their patronage." Thomas v. United States (In re Thomas), 246 B.R. 500, 506 (E.D. PA. 2000). Goodwill is considered intangible property and is divided into two categories: (1) Professional goodwill; and (2) economic goodwill. Id. As explained by the Court in Thomas:

> Professional goodwill is intrinsically tied to the attributes and/or skills of certain individuals. (quotation omitted). This type of goodwill arises from an individual professional's reputation, specialized skills and judgment. (citations omitted). Because professional goodwill is inextricably intertwined with an individual's skill and attributes, professional goodwill cannot be valued and cannot survive if that individual is disassociated from the business. (citation omitted). By contrast, economic goodwill is wholly attributable to the business itself and can be alienated from the individuals in the business. (citation omitted). As a result, economic goodwill can be valued.

Id. Claimant argues that the goodwill associated with D & E's business must be characterized as professional goodwill. Because professional goodwill cannot be valued, Claimant maintains that

---

Claimant's Brief in Response to Debtor's Proposed Findings of Fact and Conclusions of Law.

[6]Mr. Patz placed a value of $111,505 on D & E's route location and goodwill. See Reinhart Exhibit 14. In addition, Mr. Patz placed a value of $5,300 on the cash that was in the placed equipment as of the date that Claimant took over its operation and the cash collected by Claimant from the placed equipment during this time, neither of which Debtor maintains were accounted for by Claimant. See Reinhart Exhibit 14. This cash is referred to as "stolen changer money" in Mr. Patz's appraisal. See Reinhart Exhibit 14.

9

Debtor cannot be credited with the goodwill of D & E's business. Although I explain below that I disagree with Claimant's categorization of the type of goodwill associated with the operation of D & E's business as professional goodwill, I nonetheless agree with Claimant that I will not reduce the Claim for the goodwill of D & E's business under the facts presented in this case.

I categorize the goodwill associated with the operation of D & E's coin operated vending and amusement business as economic goodwill and not professional goodwill because the operation of such a business does not require skills, judgment, reputation or knowledge that are so highly specialized and so inextricably intertwined that they cannot be transferred to another person. The goodwill associated with the operation of D & E's business is better defined as economic goodwill because it is attributable to the business itself and the inventory owned by the business (i.e., the actual vending and amusement machines in place on location or offered for sale), rather than the reputation or specialized skills, knowledge or judgment of the individual who owns and operates the business.[7] In addition, because the goodwill associated with D & E's business is attributable to the business itself, it can be alienated from the individual involved with operating the business and valued. The goodwill associated with D & E's business, therefore, is not professional goodwill. Nonetheless, I find that Debtor should not be credited with the goodwill of D & E's business because Claimant did not purchase Debtor's business. Claimant acquired D & E's assets by enforcing its security agreement, repossessing the equipment, and taking over the collections from the placed equipment. Under these facts, I will not credit Debtor

---

[7] A game or vending machine in place at a customer's location requires no initial sales call or marketing to the customer, requires no installation or start-up expense, and is immediately generating revenue. A machine in place at a customer is worth more to its owner than an exact duplicate of the machine in a warehouse. This constitutes economic goodwill because it has nothing to do with the skills, knowledge, or abilities of any employee of the company.

with goodwill to reduce the amount of the claim.[8] Therefore, I will not adjust Claimant's claim to account for the goodwill of D & E's business.

I next address whether Debtor should be credited for the cash allegedly not accounted for by Claimant relating to the placed equipment. Debtor maintains that Claimant never properly accounted for the cash that was stored in the placed equipment when Claimant took over operation of the placed equipment. In addition, Debtor maintains that Claimant never properly accounted for the cash he had previously collected from the placed equipment. While Debtor argues that Claimant did not properly account for this cash, Debtor offered no evidence such as records, logs, statements or any other type of documentary or other evidence to support this argument and Mr. Patz testified that he had no personal knowledge concerning Claimant's alleged failure to account for this cash. Claimant, however, offered extensive records of his collections. See Claimant Exhibit 6. Based on this evidence, I find that Claimant met his burden of persuasion on this issue and established that he had properly accounted for the cash that was in the placed equipment at the time he took over operation of the placed equipment and for the cash collections he made from the placed equipment while he was operating the placed equipment. See Claimant Exhibit 6. I will therefore make no adjustment to Claimant's claim to account for this cash.

Finally, I turn to the valuation of the equipment repossessed by Claimant. Both parties agree that the total amount of principal and interest owed by Debtor to Claimant

---

[8]This is a very close call because, although no goodwill was formally transferred to Claimant (through the purchase of an entire business for example), the machines, in place, have some inherent "goodwill" that is attached to them. Because the parties had no express transfer of the business or goodwill, however, I believe that no specific credit should be allowed to Debtor to reduce the amount of the claim by something separately attributable to goodwill.

($464,820.61)[9] must be reduced by the fair market value of the repossessed equipment to determine the actual amount of Claimant's claim. The parties, however, do not agree on the fair market value of the repossessed equipment.

I begin by noting that I find the testimony presented by Debtor concerning the condition and value of D & E's equipment and the testimony and the appraisals performed by Debtor's expert, Mr. Patz, very credible and persuasive, while the testimony and appraisal of Claimant's expert, Kenneth E. Iman, was less than convincing. Mr. Patz is the owner and President of M & P Amusements, and he has been in the coin operated amusement and vending machine business for 45 years. The majority of Mr. Patz's experience has been with amusement machines, but he also has experience selling vending machines. Mr. Patz testified that he was familiar with D & E's inventory of equipment and that it was usually in excellent condition, and if not, it was in working condition. He also testified that unless the equipment had been totally gutted, repairs on most pieces of equipment were usually minor, with repair costs usually averaging 10% of the equipment's value. Mr. Patz also stated that the majority of D & E's equipment was on location, and it therefore had to be in good working condition or the owner of the location would have complained and demanded that the faulty equipment be removed.[10] Finally, Mr. Patz testified that he has experience with all of the pieces of D & E's equipment because he has bought and sold similar items in the past.

Unlike Mr. Patz, Mr. Iman's experience with amusement and vending machines is

---

[9] See note 5, supra.

[10] Mr. Iman also testified that he assumed that the equipment on location was in working condition.

much less extensive and much more limited. Although Mr. Iman testified that he has been involved with buying and selling games for twenty five years,[11] his experience is limited to the liquidation market, with the bulk of his time having been spent selling equipment at auctions. Furthermore, unlike Mr. Patz, whose second appraisal of the D & E amusement and vending equipment was based on an analysis and comparison of the liquidation, wholesale, and retail value of each piece of equipment, see discussion below, Mr. Iman testified that his appraisal of the D & E amusement and vending equipment was based only on the liquidation value of each piece of equipment. The second appraisal performed by Mr. Patz, therefore, is much more comprehensive and is the most accurate evaluation of the fair market value of the D & E amusement and vending equipment than the appraisal performed by Mr. Iman.

As noted earlier, Mr. Patz prepared two appraisals of D & E's equipment for Debtor. The first appraisal was performed in April of 2004, and was requested by Debtor because he was contemplating a sale of the business. Mr. Patz appraised only D & E's amusement equipment during his first appraisal, he did not appraise the vending equipment, and concluded that D & E's amusement equipment had a fair market value of $548,681.50. See Reinhart Exhibit 2.[12] In April of 2005, Mr. Patz conducted a second appraisal. This appraisal, however, involved of all of D & E's amusement and vending equipment, both the equipment

---

[11]Mr. Iman also testified that he bought and sold vending equipment in the past. In addition, Mr. Iman is presently employed as an Assistant Professor of Marketing and Management at Baltimore International College. Mr. Iman testified that he also works part-time earning $7.00 per hour in a video game room where Mr. Iman categorized himself as the "on-site person." To complete his statement of his credentials, Mr. Iman testified that he also has a background in mental health and that he teaches resume development.

[12]Mr. Patz stated that the $548,681.50 figure was "neither a retail nor wholesale price and is quite realistic." Reinhart Exhibit 2.

13

stored in D & E's workshop and warehouse and the placed equipment. See Reinhart Exhibit 14.

Mr Patz testified that Debtor supplied him with the list of equipment for both appraisals, but that he valued each piece of equipment.[13] He explained that he assigned several values to each item in his second appraisal: a "low" value, which Mr. Patz described as the price one would expect to get at a fire sale or a public auction with no reserve, an "average" value, which Mr. Patz described as the wholesale price (i.e., the price one could expect to receive for the sale of equipment in decent condition and the price an operator would pay to a distributor for the equipment); and a "retail" value. In his second appraisal, Mr. Patz concluded that the amusement and vending equipment located at the placed locations had a "low" value of $158,190, an "average" value of $246,635 and a "high" value of $320,695, and that the amusement and vending equipment located at D & E's warehouse and workshop had a "low" value of $47,660 and an "average" value of $88,520.[14] See Reinhart Exhibit 14.

Mr. Patz also valued several items of placed equipment that Debtor maintains were on location at the time Claimant took over the locations, but which Claimant did not

---

[13] Debtor used Claimant's inventory of repossessed equipment to compile the list of equipment used by Mr. Patz in his second appraisal. Because Debtor maintains that Claimant's inventory does not account for all of the placed equipment on site at the locations when Claimant took over their operation and for all of the repossessed equipment stored in D & E's warehouse and workshop, Mr. Patz's second appraisal deals separately with these allegedly unaccounted for items.

[14] Mr. Patz did not assign "retail" values to any of the equipment stored at D & E's warehouse and workshop, only "low" and "average" values were assigned to these pieces of equipment. See Reinhart Exhibit 14. In addition, Debtor acknowledges in his brief that an error was made on page 7 of Reinhart Exhibit 14 in calculating the total of the "average" values assigned to the equipment located in D & E's warehouse and workshop. Page 7 of Reinhart Exhibit 14 shows this number to be $73,070, while Debtor, in his brief, calculates this number to be $88,715. My calculations, however, reveal that the total of the "average" values attributed to the equipment located in D & E's warehouse and workshop is $88,520.

include in his inventory of "placed equipment." Mr. Patz gave the following values for these items of placed equipment: A "low" value of $36,500, an "average" value of $52,235, and a "retail" value of $65,915. See Reinhart Exhibit 14. In addition, Mr. Patz valued several items of equipment that Debtor maintains were located in D & E's warehouse, but which were not included by Claimant in his inventory of repossessed equipment. Mr. Patz determined that the "low" value of this equipment was $14,700, and that the "average" value was $27,850. See Reinhart Exhibit 14. Finally, Mr. Patz valued the compact discs and prize and snack inventory that were stored in the placed equipment at $17,350 as of the date that Claimant took over the operation of the placed equipment.[15]

Having reviewed all of the evidence before me, I find the "average" values ascribed by Mr. Patz to D & E's amusement and vending equipment in his second appraisal to best approximate the fair market value of these items for the purpose of this dispute. As Mr. Patz testified, the "average" value is the price one could expect to receive for the sale of equipment in decent condition. I find this to be a better indication of fair market value than the "low" value, which Mr. Patz described as the price one could expect to obtain at a fire sale, or the "retail" value.[16] I therefore find that the fair market value of the amusement and vending equipment located at the placed locations and accounted for in Claimant's inventory of placed

---

[15] The compact discs were located in the jukeboxes that D & E had placed at various route locations, the snack inventory was located in the vending machines that D & E had placed at various route locations and the prize inventory was located in the amusement machines that D & E had placed at various route locations.

[16] Once again, I find it a very close call whether to use the "retail" value for machines that are in place at a customer. As before, however, I am led by the totality of the circumstances in this matter, which leads me to conclude that the best statement of the fair market value of the machines on location is Mr. Patz determination at the "average" value.

Document      Page 16 of 18

equipment was $246,635 and that the fair market value of the amusement and vending equipment stored in D & E's warehouse and workshop and accounted for in Claimant's inventory of repossessed equipment was $88,520.

I also find credible and persuasive Debtor's testimony that certain items of amusement and vending equipment were present at the placed locations and in D & E's warehouse and workshop, but were not accounted for in Claimant's inventory of placed and repossessed equipment. Therefore, Debtor must be credited for these items. Based on Mr. Patz's testimony and appraisal, which I find once again to be credible and persuasive, I find the fair market value of the items of placed equipment that were on location at the time Claimant took over the locations, but which Claimant did not include in his inventory of placed equipment,[17] was $52,235, and that the fair market value of the items of equipment that were located in D & E's warehouse and workshop but not included in Claimant's inventory of repossessed equipment was $27,850. See Reinhart Exhibit 14. Adding all of these figures together, I conclude that the fair market value of all the D & E equipment repossessed by Claimant was $415,240.

I also find that Claimant failed to account for the value of the compact discs and snack and prize inventory that were stored in the placed equipment at the time that Claimant took over operation of the placed equipment and that the fair market value of these items must

---

[17] My determination that this inventory of machines existed but had been omitted from Claimant's inventory list and appraisal is based on my distrust of the testimony presented by Claimant and his employees and staff. Simply put, I just did not believe them; their testimony was wholly incredible.

16

also be deducted from the amount due to Claimant.[18] Because I find Mr. Patz's appraisal of these items to be credible and persuasive, I find that the fair market value of the compact discs and snack and prize inventory stored in the placed equipment at the time that Claimant took over its operation was $17,350. See Reinhart Exhibit 14. Adding this $17,350 figure to the fair market value of all of the D & E equipment repossessed by Claimant, which I previously found to be $415,240, results in a total amount of $432,590, which represents the fair market value of all D & E equipment repossessed by Claimant, including the compact discs, and snack and prize inventory stored in the placed equipment when Claimant took over its operation. This sum ($432,590) must be deducted from the amount owing to Claimant in principal and interest ($464,820.61), to arrive at $32,230.61, which represents the amount still owed to Claimant on his claim. Accordingly, I find that Claimant holds a claim against Debtor's estate in the amount of $32,230.61.

      An appropriate Order follows.

Date: July 11, 2007

---

[18]My determination that the inventory of CD's, snacks, and prizes existed but had been omitted from Claimant's appraisal is based on my distrust of the testimony presented by Claimant and his employees and staff. See footnote 17, above.

17

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                                          :
DOUGLAS M. REINHART,                            :     Case No. 05-25791REF
    Debtor                                      :     Chapter 13

## ORDER

AND NOW, this 11th day of July, 2007, upon my consideration of Debtor's Objection to the proof of claim filed by Craig E. Dallmeyer, and for the reasons set forth in the foregoing Memorandum Opinion, it is hereby ORDERED that Debtor's Objection to the proof of claim filed by Craig E. Dallmeyer is SUSTAINED IN PART and OVERRULED IN PART and Craig E. Dallmeyer is hereby deemed to hold a claim against the estate in the amount of $32,230.61.

BY THE COURT

_____
RICHARD E. FEHLING
United States Bankruptcy Judge